IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br><br><br>vs.<br><br><br><br>VICTOR JOHN BAILEY,<br><br>  Defendant. | MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE<br><br><br><br><br><br>Case No. 2:06-CR-200 TS |

This matter is before the Court on Defendant's Motion to Suppress Evidence.[1] An evidentiary hearing was held on the Motion on July 26, 2006. Thereafter, Defendant submitted his supporting memorandum on August 23, 2006,[2] and the government filed its memorandum on September 7, 2006.[3]

---

[1] Docket 13.

[2] Docket No. 23.

[3] Docket No. 24.

I.     BACKGROUND

Defendant is charged with one count of Possession of Firearm by a Convicted Felon. Defendant argues that: 1) he was unlawfully detained; and 2) the pat-down search of his person on March 9, 2006, was in violation of his rights under the Fourth Amendment because the officer did not have reasonable and articulable suspicion to believe that Defendant was armed and dangerous. Consequently, Defendant seeks the exclusion of all evidence seized from his person and his vehicle as the fruit of an illegal search.[4] The government counters that law enforcement officers had a reasonable suspicion, based upon a totality of the circumstances, that Defendant had committed or was about to commit a crime, and the weapons frisk of Defendant was reasonable for officer safety. Further, the government contends that the evidence gun and drugs was seized incident to Defendant's arrest for carrying a concealed weapon.[5]

II.    FACTUAL BACKGROUND

For purposes of this Motion to Suppress, the Court find the following facts:

On March 9, 2006, Salt Lake City Police Officer Rochelle Brown was dispatched to investigate a report of a man passed out at the wheel of his car in the parking lot of a convenience store. Officer Steed also responded as back-up. Prior to the officers' arrival on the scene, paramedics from the Salt Lake City Fire Department had arrived to evaluate Defendant for potential medical concerns. Officer Brown was informed by fire/paramedic personnel that Defendant was "acting so weird, he's got to be high because I don't smell any alcohol on him,

---

[4] Docket No. 23, at 1.

[5] Docket No. 24, at 1-2.

but he's acting really, really weird."[6]  The paramedic evaluation found nothing medically wrong with Defendant.

After Defendant was medically cleared, Officer Brown approached him and asked for his identification.  Defendant produced an identification card, and Officer Steed took it to check the information and perform a check for outstanding warrants.  While this check was being performed, Officer Brown asked Defendant identifying questions about where he lived and why he was in the parking lot.  Defendant responded that he lived just around the corner, and that he had fallen asleep while drinking coffee.

During the course of the conversation, Officer Brown observed that Defendant was moving his hands around a lot, acting "very jittery," looking back and forth rapidly, and acting nervous.  Based upon Officer Brown's training as a police officer and her previous medical training and experience working in a hospital emergency room, she believed it possible that Defendant was under the influence of a controlled substance, and wanted to investigate whether Defendant had been operating his vehicle while under such influence.[7]

Officer Brown asked Defendant if he had any history with law enforcement, and Defendant responded that he had a history involving weapons.  At that point, Officer Brown asked Defendant to step out of his vehicle so she could search him for weapons.  Defendant complied.  Officer Brown asked Defendant if he had any weapons, to which Defendant

---

[6] Tr. at 2.

[7] As stated in Defendant's own memorandum, "Officer Brown testified that she thought Bailey might be under the influence of drugs and that, at that point, she considered the encounter to be a driving under the influence of drugs investigation."  Docket No. 23 at 2.

responded that he had a knife in his jacket pocket. Officer Brown handcuffed Defendant, retrieved the knife and arrested Defendant for possession of a concealed weapon. She then completed a pat-down search for other weapons, and felt an item that felt like a pocketknife, but turned out to be a baggy of marijuana and a medallion. Upon finding the drugs, Officer Brown informed Defendant that he was going to jail.

Defendant was placed in a patrol vehicle and Officer Brown searched Defendant's car incident to his arrest. Officer Brown found a loaded firearm on the center console next to where Defendant had been sitting.

II.     DISCUSSION

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . .,"[8] subject to a few specifically established and well-delineated exceptions. One such exception was set forth by the Supreme Court in *Terry v. Ohio.*[9]

> In *Terry v. Ohio*, the Supreme Court crafted a 'stop-and-frisk' exception to the general rule that seizures be supported by probable cause. Under *Terry*, a law enforcement officer may stop a person without probable cause for arrest if the officer has a reasonable and articulable suspicion that the person might be involved in criminal activity. If the officer has such reasonable and articulable suspicion, she may also conduct a protective frisk of the suspect's outer clothing if she reasonably believes that the suspect might be armed and presently dangerous. However, the sole justification of the search . . . is the protection of the police officer and other nearby, and it must therefore be confined in scope to an intrusion

---

[8] U.S. Const. amend. IV.

[9] 392 U.S. 1 (1968).

> reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of a police officer. When evaluating the validity of a *Terry* stop, the totality of the circumstances – the whole picture – must be taken into account."[10]

Law enforcement officers must have "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."[11]

The Tenth Circuit has clarified that a court must "conduct a two-step inquiry to determine whether an investigative detention is reasonable under the Fourth Amendment."[12] First, the Court must "ascertain whether the detention was justified at its inception," and second, "whether the officers' actions are reasonably related in scope to the circumstances which justified the interference in the first place."[13]

    A.    R<small>EASONABLE SUSPICION FOR</small> T<small>ERRY</small> <small>STOP</small>.

        1.    <u>Justified at its inception</u>.

"For a detention to be valid, the officer must have an articulable suspicion that a detainee has committed or is about to commit a crime. Neither inarticulate hunches nor unparticularized suspicion will suffice to justify an investigatory detention. However, in determining the reasonableness of an investigative detention, common sense and ordinary human experience

---

[10] *United States v. Harris*, 313 F.3d 1228, 1233-34 (10th Cir. 2002) (internal quotations and citations omitted).

[11] *Gallegos v. City of Colorado Springs*, 114 F.3d 1024, 1028 (10th Cir. 1997).

[12] *Id.*

[13] *Id.* (internal quotations and citations omitted).

must govern over rigid criteria. The Fourth Amendment does not require police officers to close their eyes to suspicious circumstances."[14]

In this case, Officer Brown was dispatched to the scene on a report of a man passed out at the wheel of a car in the parking lot of a convenience store. When she arrived at the scene, she was told by the fire captain that Defendant was "acting so weird" and "he's got to be high because I don't smell any alcohol on him, but he's acting really, really weird."[15] Other medical personnel informed her that there was nothing medically wrong with Defendant.

During Officer Brown's initial contact with Defendant, she observed Defendant moving his hands around a lot, acting jittery, looking back and forth rapidly, and acting very nervous. Drawing from her experience as a trained police officer and former employment in a hospital emergency room, Officer Brown believed it was possible that Defendant was under the influence of drugs, and considered the encounter a possible DUI investigation. Further, during the course of the conversation, Defendant provided inconsistent statements, including that he was sleeping in his car although he lived around the corner, and that he had fallen asleep while drinking coffee. Defendant also informed Officer Brown of a prior criminal history with weapons.

The Court finds that the investigatory detention of Defendant was justified at its inception, as Officer Brown possessed an articulable suspicion that, given the totality of the circumstances, Defendant had, or was about to, commit a crime, namely, driving a vehicle while under the influence of a controlled substance.

---

[14] *Id.* at 1028 (internal quotations and citations omitted).

[15] Tr. at 8.

      2.      <u>Reasonably related in scope</u>.

"The second step in determining the reasonableness of an investigative detention consists of determining whether the officers' actions are reasonably related in scope to the circumstances which justified the interference in the first place."[16]

Here, the initial investigatory detention was based upon a suspicion of possible driving under the influence of a controlled substance. The actions undertaken by Officer Brown during the incident were consistent with that investigatory posture. While information ultimately indicated criminal violations of a different sort, Officer Brown was reasonable and justified in her actions. The Court finds that Officer Brown's interaction with Defendant was reasonably related in scope to her initial suspicions.

Based on the above, the Court finds that the investigatory detention of Defendant was valid under *Terry* and its progeny, and that it did not exceed the scope of its justification.

    B.    PROTECTIVE FRISK JUSTIFIED.

"Since police officers should not be required to take unnecessary risks in performing their duties, they are authorized to take such steps as are reasonably necessary to protect their personal safety and to maintain the status quo during the course of a *Terry* stop."[17]

During the course of her initial investigation of Defendant discussed above, Officer Brown became aware of several potential threats to her safety or the safety of those around her. Defendant informed her both that he had a prior history with weapons, and that he presently had

---

[16] *Gallegos*, 114 F.3d at 1028 (internal quotations and citations omitted).

[17] *United States v. Perdue*, 8 F.3d 1455, 1462 (10th Cir. 1993).

a knife in his jacket pocket.  This information, combined with Officer Brown's observations that Defendant was nervous and jittery, gave her legitimate concern for her safety.  Further, the possibility that Defendant was under the influence of controlled substances added to the potential unpredictability and volatility of the situation.  Consequently, the Court finds that Officer Brown's asking Defendant to get out of the car, conducting a frisk, and handcuffing of Defendant were both objectively and subjectively reasonable.

Further, the Court finds that the frisk of Defendant by Officer Brown was limited in scope and manner to objects which could reasonably be weapons.  The "bulge" felt by Officer Brown, while it turned out to be a baggy of marijuana and a "medallion," was legitimately of concern to Officer Brown, especially considering the fact that she had just removed a knife from Defendant's person.

### C. REASONABLENESS OF SEARCH.

Although Defendant argues that he was unlawfully "seized" when asked to step from his vehicle, frisked and handcuffed, these actions to not necessarily elevate the encounter into an arrest.  "[A] *Terry* stop does not automatically elevate into an arrest where police officers use handcuffs on a suspect . . ."[18]  In fact, "[p]olice officers are authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of a [*Terry*] stop."[19]  "As long as the precautionary measures employed by officers during

---

[18] *Gallegos*, 114 F.3d at 1030.

[19] *Id.* (internal quotations and citations omitted) (noting that "[a]t least nine courts of appeals, including this circuit, have determined the use of "intrusive precautionary measures" (such as handcuffs or placing a suspect on the ground) during a *Terry* stop do not necessarily turn

a *Terry* stop are reasonable, they will be permitted without a showing of probable cause."[20] Finally, "[i]n determining whether the precautionary measures were reasonable, the standard is objective – would the facts available to the officer at the moment of the seizure . . . warrant a man of reasonable caution in the belief that the action taken was appropriate."[21]

The Court finds that Officer Brown's request that Defendant step out of his vehicle, as well as her frisking and handcuffing Defendant, did not convert the encounter into an arrest. The discovery of the concealed weapon – during a lawful protective frisk – constituted probable cause for arrest, which then took place.

    D.    S<span>EIZURE OF CONTRABAND</span>.

The Supreme Court has specifically carved out an exception to warrantless searches in the case of searches incident to arrest.[22] "'[A] lawful custodial arrest creates a situation which justifies the contemporaneous search without a warrant of the person arrested and the immediately surrounding area.'"[23]

In this case, after Officer Brown found the knife Defendant admitted he was carrying in his jacket pocket, she arrested him for carrying a concealed weapon.[24] Therefore, the Court finds

---

a lawful *Terry* stop into an arrest under the Fourth Amendment.").

[20] *Id.*

[21] *Id.* at 1030-31 (internal quotations and citations omitted).

[22] *Chimel v. California*, 395 U.S. 752, 762-763 (1969).

[23] *United States v. Edwards*, 242 F.3d 928, 938 (10th Cir. 2001) (quoting *New York v. Belton*, 453 U.S. 454, 457 (1981)).

[24] Carrying a concealed weapon is a violation of Utah Code Ann. § 76-10-504(1)(a).

that Officer Brown's search of Defendant's person and vehicle thereafter were clearly searches incident to Defendant's lawful arrest.

As a final matter, the Court notes that Defendant's Memorandum in Support of Motion to Suppress Evidence discusses this incident under a "community caretaking" analysis.[25] However, the government does not justify its actions in this case under the community caretaking doctrine, nor is it even addressed in the government's memorandum.  Further, the Court notes that the community caretaking doctrine allows for a limited seizure "in order to ensure the safety of the public and/or the individual, regardless of any suspected criminal activity . . ." and is "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute."[26]  As the government has argued that the officer was, in fact, suspicious of unlawful activity on the part of Defendant, the Court will not address this issue.

III.   CONCLUSION

Based upon the above, and viewing the totality of the circumstances, the Court concludes that the investigative detention and frisk in this case were justified at the inception, and reasonably related to the scope of the interference and, therefore, were reasonable under the Fourth Amendment.  Further, the Court finds that the seizure of the drugs and gun were conducted pursuant to a lawful arrest.

Therefore, it is hereby

---

[25] Docket No. 23, at 5.

[26] *Gallegos*, 114 F.3d at 1029 n.4 (internal quotations and citations omitted).

ORDERED that Defendant's Motion to Suppress Evidence (Docket No. 13) is DENIED. It is further

ORDERED that the time from the filing of the Motion to Suppress, June 12, 2006, through the trial date of January 3-4, 2007, is excluded from the computation of the Speedy Trial Act time pursuant to 18 U.S.C. §§ 3161(h)(1)(F) and (J).

SO ORDERED.

DATED  October 10, 2006.

BY THE COURT:

_____
TED STEWART
United States District Judge